THE PEOPLE *ex rel.* George R. H. Hughes

*v.*

SAMUEL APPLETON.

*Filed at Ottawa November 20, 1882—Rehearing denied March Term, 1883.*

1. ATTORNEY AT LAW—*breach of private trust as ground for striking from roll of attorneys.* Where property is conveyed to an attorney in trust, without his professional advice, and he mortgages the same, for the purpose of raising a sum of money which he claims is due him from the *cestui que trust,* and the trustee afterwards sells the property and appropriates the proceeds of the sale to his own use, the relation of client and attorney not being created by such trust, his conduct, however censurable as an individual occupying the position of a trustee, is not such as to warrant the summary disbarring of him on motion to this court to strike his name from the roll of attorneys, but the injured party must be left to his proper remedy by suit.

2. Although the general rule is, that an attorney at law will not be disbarred for misconduct not in his professional capacity, but as an individual, there are cases forming an exception where his misconduct in his private capacity may be of so gross a character as to require his disbarment.

This was an information filed in this court by George R. H. Hughes, against Samuel Appleton, an attorney of this court, to have his name stricken from the roll of attorneys of this State, on the grounds which appear in the opinion of the court.

Messrs. HYNES, ENGLISH & DUNNE, for the relator:

A trustee, except by agreement, is entitled to no compensation for his services. *Huggins* v. *Ryder,* 77 Ill. 360.

A solicitor who is a trustee is liable for all losses occurring. from a breach of trust, and his name may be stricken from the rolls of the court for a willful breach. Perry on Trusts, sec. 846; *In re Chandler,* 22 Beav. 253; *In re Hall,* 2 Jur. (N. S.) 633.

The name of a solicitor who willfully advises a breach of trust, may be stricken from the rolls. *Goodwin* v. *Gosnell,* 2 Coll. 457.

Even without statutory provision the right to determine who shall appear before them as attorneys is incidental to all common law courts, and is also necessary for the respectability of the profession. *Mills' case,* 1 Mich. 392; *Ex parte Brown,* 1 How. (Miss.) 303; *Secomb's case,* 19 How. (U. S.) 9; *Beem* v. *State,* 12 Ark. 149; *Randall's case,* 11 Allen, 472; *Rice* v. *Commonwealth,* 18 B. Mon. 482.

As to other cases of disbarment for improper conduct, both professional and as a private individual, see *Smith's case,* 1 Yerg. 228; *Percy's case,* 26 N. Y. 651; *Leigh's case,* 1 Munf. 481; *Peterson's case,* 3 Paige, 510; *Delano's case,* 6 L. Rep. (N. H.) 660; *Sanborn* v. *Kimball,* 64 Maine, 140; *Ex parte Brownsall,* Cowp. 829; *Baker* v. *Commonwealth,* 10 Bush, 592.

Mr. EDWARD ROBY, for the respondent:

We neither deny nor seek to abate the responsibilities of an attorney at law. They are reviewed in the following authorities: *People* v. *Allison,* 68 Ill. 152; *People* v. *Barker,* 56 id. 300; *Matter of Percy,* 36 N. Y. 651; *In re Peterson,* 3 Paige, 510; *Grant* v. *Chester,* 17 How. Pr. 260; *People* v. *Brotherson,* 36 Barb. 662; *Matter of Dakin,* 4 Hill, 42; 1 Tidd's Practice, 67, 87, 88, and notes; 1 Archbold's Practice, Q. B. 60–68; Bacon's Abridgment, title "Attorney," H; *Pearson* v. *Sutton,* 5 Taunt. 364; *Duncan* v. *Richmond,* 7 id. 391; *Goring* v. *Bishop,* 1 Salk. 87; *Matter of Lowe,* 8 East, 237; *In re Fenton,* 5 N. & M. 239; 1 H. & W. 310; *In re Chitty,* 2 Dowl. 421; *Ex parte Deane,* id. 533; *Ex parte Cowie,* 3 id. 600; *Cocks* v. *Harman,* 6 East, 404; *Ex parte Schwalbanker,* 1 Dowl. 182; *In re Cutts,* 16 L. R. (N. S.) 715; *Austin* v. *Chambers,* 6 Cl. & Fin. 37; *Matter of Husson,* 26 Hun, 132; *Matter of Aitkin,* 4 B. & A. 47; *In re Cardross,* 5 M. & W. 545; *Matter of Hoskin,* 18 Hun, 42; *People* v. *Goodrich,* 79 Ill. 148; *People* v. *Leary,* 84 id. 190; *People* v. *Ford,* 54 id. 520; *People* v. *Lamborn,* 1 Scam. 123; *People*

v. *Palmer*, 61 Ill. 255 ; *People* v. *Harvey*, 41 id. 277 ; *People* v. *Cole*, 84 id. 327.

The court will not interpose in this manner as to any writings or money received by an attorney on any other account except in the way of business as an attorney, but will leave the party to his ordinary action.   Merrifield on Law of Attorneys ; 2 Hawkins' Pleas of the Crown, chap. 22, sec. 10 ; Tidd's Practice, 478 ; Archbold's K. B. Practice, 338–341.

Appleton had a property in the land to the extent of his entire claim, and had a right, to that extent, to apply it to his own use.   *Livingston* v. *Newkirk*, 3 Johns. Ch. 318 ; *Woodward* v. *Chichester*, 2 Dyer, 185 b ; *Woodward* v. *Lord Darcy*, 1 Plowd. 184 ; *Watts* v. *Watts*, 2 McCord's Ch. 82 ; *Page* v. *Patton*, 5 Pet. 312 ; *Langton* v. *Higgs*, 5 Sim. 228 ; *Tipping* v. *Power*, 1 Hare, 405 ; *Chissum* v. *Dewes*, 5 Russ. 29 ; *Rogers* v. *Hosack's Exr.* 18 Wend. 319 ; *Decker* v. *Miller*, 2 Paige, 149 ; *Loane* v. *Casey*, 2 W. Black. 967 ; *Franks* v. *Cooper*, 12 Ves. 763 ; *Chickering* v. *Failes*, 26 Ill. 508 ; *Griffin* v. *Marine Co.* 52 id. 131.

An executor or trustee may reimburse himself for money advanced for the benefit of the estate or the *cestui que trust*. Ram on Assets, 343 ; *Shelly* v. *Sackville*, And. 24 ; Perry on Trusts, sec. 485 ; *Balsh* v. *Hyham*, 2 P. Wms. 453 ; *Jarvis* v. *Wolferston*, 18 L. R. Eq. 18 ; *Snyder's Appeal*, 72 Mo. 253 ; *Burney* v. *Spear*, 17 Ga. 225.

The court will not proceed summarily with an attorney when there is any fact in dispute.   *In re Phillips*, 3 Jur. 479 ; 1 W. W. & H. 418, Q. B.

Mr. Justice Sheldon delivered the opinion of the Court :

This is an information on the relation of George R. H. Hughes, filed in this court, against Samuel Appleton, asking for a rule to show cause why his name should not be stricken from the roll of attorneys of this State.   The rule having been granted, cause has been shown.

The case presented before us is of this character: In March, 1870, the relator, Hughes, became the owner of a lot of ground in the city of Chicago, known as sub-lot 3, of lot 1, block 3, original town of Chicago, on North Clark street, paying at that time at the rate of $600 a front foot for the lot, which was twenty-one feet and some inches fronting on Clark street. In April, 1870, he borrowed $5000 from the Connecticut Mutual Life Insurance Company, secured by a mortgage on this property. In April, 1874, Hughes' equity of redemption was sold at an execution sale under a judgment in favor of Gookins & Roberts, and bought in by them for the full amount of the judgment, and the sheriff's certificate of sale was issued to them entitling them to a sheriff's deed, July 20, 1875. In May, 1874, after the sale of Hughes' equity in the property, a suit was brought by the Connecticut Mutual Life Insurance Company to foreclose under their mortgage, making Hughes, and Gookins & Roberts, parties defendant, and a foreclosure sale therein took place on November 17, 1875, which was four months after Gookins & Roberts had become entitled to a sheriff's deed under their certificate of purchase in 1874. At the instance of Hughes, Thomas B. Bryan became the purchaser of the property at this foreclosure sale, Hughes loaning him $6000, taking a mortgage, to secure $5000 of the money, on the property, and $1000 being secured by a mortgage on other property of Bryan, the latter giving his notes for the $6000. Subsequently, Bryan requested Hughes to buy the property back from him for the price which he had paid for it, and surrender his notes, which Hughes did, and instead of taking the deed in his own name, he had Bryan, on June 16, 1878, make the conveyance of the property to Appleton, the respondent, the latter executing to Hughes a written declaration of trust, which Hughes retained without recording. Shortly after the lot was conveyed to Appleton, efforts were made by Hughes and Appleton to obtain a building loan for the purpose of improving the

property, these efforts extending to October, 1878, when the project of raising a building loan was abandoned. On December 11, 1878, Appleton secured a loan of $1000 by mortgaging the lot to one Wright, which was done without any communication with Hughes on the subject. Again, on May 7, 1879, Appleton obtained a loan of $1500 on the lot, executing a trust deed to one Snowhook to secure the same, and took up the Wright mortgage,—and this, also, without any communication with Hughes. And again, on February 24, 1880, Appleton conveyed the lot to Frank H. Dickey, by warranty deed, for the expressed consideration of $4000, subject to the Snowhook incumbrance of $1500,—and this without the direction of Hughes. On February 25, 1880, one Pease, as assignee of the Gookins & Roberts certificate of purchase, filed a bill in the Superior Court of Cook county, making Appleton and Hughes parties defendant, laying claim to the proceeds of the property, and praying the court to restrain Appleton from paying them over. To this bill Hughes demurred, which demurrer was sustained, and leave given to amend the bill. Afterward, the Pease bill was dismissed, and within a few days a new bill was filed by Pease in the circuit court of Cook county, in which Appleton and Hughes, and the Connecticut Mutual Life Insurance Company, were made parties defendant. Hughes filed his cross-bill setting forth his claim, and asking a conveyance from Dickey, or if that should not be, a decree against Appleton for the value of the property. This second suit is still pending and undetermined. It was commenced June 19, 1880, and on November 22, 1880, it was dismissed as to Dickey, and a few days thereafter Dickey conveyed the lot to Eugene Pike.

The claim on the part of the relator is, that the trust with respect to the property in question was a matter of professional employment; that the acceptance of the trust, and the action under it, was in the capacity of an attorney at law; that the mortgaging of the lot, and the sale of it afterward,

was all an iniquitous fraud, perpetrated for the purpose of wronging relator out of his property, and dishonestly appropriating it to the use of respondent; that the Pease suit to restrain the paying over of the proceeds of the property was but a sham and a device of respondent in his scheme of fraud to furnish a pretext for the withholding of such proceeds. The respondent insists, on the contrary, that this trust was not professional, but private business, and that all his conduct was honest and with rightful motive; that he had made disbursements, incurred liabilities, and performed services with respect to the property, to an amount exceeding that of the mortgages he placed upon the lot; that relator was insolvent; that respondent made application to him for payment, but could get nothing; that he told relator if he did not pay him respondent would secure himself on the property; that afterward he borrowed $1000, thinking that might suffice for his need, and gave the first mortgage, but finding that he needed an additional $500, he obtained a loan of $1500 on the lot, gave the second mortgage, and took up the first one; that the money thus raised was no more than the amount of what he regarded as justly his due, and he thought himself justified in thus securing his pay; that the sale of the property was made with the approval of relator, and that he had no connection with the bringing of the Pease suit. Both the parties give testimony in support of their respective claims.

We concur in the view of the respondent that the trust which was undertaken in this case was not under any professional employment. Relator's own testimony would seem so to mark it. He says: "On the 6th of July, 1878, I made a purchase from Thomas B. Bryan of a lot on North Clark street, for $6000. After making my terms with Mr. Bryan at the Fidelity Safety Deposit vaults, I left Mr. Bryan and called on Mr. Appleton, at his office; mentioned to him that I had just made this purchase; that as he had been trustee

in a previous transaction, and particularly as I was anxious to avoid harrassment through the old Gookins & Roberts judgments, and as I wanted to get up a building as quickly as possible, and to that end raise a loan on the lot, I called to ask him if he would receive the title in trust by conveyance from Mr. Bryan. He said that he would gladly serve me in the matter, and accept the title in trust." Thus it will be seen that the deed was not made under any legal advice from respondent, but relator had, of himself, determined upon it beforehand. It was a very simple matter, the having of a deed for land made in another person's name, not giving occasion for legal advice, and relator not needing it from respondent, they both being attorneys, and the relator some fifteen years the senior in the practice of law. To hold a title in one's own name requires no skill of an attorney. There had been no previous relation of attorney and client, and that which arose between the parties from the transaction in question we regard as not being the relation of attorney and client, but that of trustee and *cestui que trust.*

It is remarked upon, as showing professional employment, that respondent charged a fee of $10 to relator on the books of Rogers & Appleton, attorneys at law, for the business he did the day he accepted the trust. Without going through with it, we will say that Mr. Rogers' explanation how this charge came to be made several months afterward, is satisfactory to us that little significance should be attached to this as evidence of the rendering of professional services. Mr. Rogers says distinctly that they never had an account with relator.

From an examination of all the testimony, we can come to no other conclusion than that respondent accepted this trust, not as an attorney at law, but simply as an individual, and that whatever of wrongful conduct there may have been, it was but that of any ordinary trustee, and not professional misconduct in the office of an attorney at law. In a similar

proceeding against an attorney, in *The People* v. *Allison*, 68 Ill. 151, this court said: "If respondent has been guilty of the misconduct alleged against him, in his private character, and not in his official capacity as an attorney, relief can only be obtained by a prosecution in the proper court, at the suit of the party injured. He can not be tried, on motion, in this summary manner." There are many authorities for the support of the doctrine thus laid down. Among them we refer to *In re Aitkin*, 4 Barn. & Ald. 47; *Cocks* v. *Harman*, 6 East, 404; *Matter of Dakin*, 4 Hill, 42; *In re Husson*, 26 Hun, 130; *Matter of Hoskin*, 18 id. 42.

We think the present comes within the class of cases above referred to, wherein the exercise of this summary jurisdiction would not be entertained where the misconduct alleged was not in the employment as attorney. But though such be the general rule, it is not to be held that there are no exceptions,—that there are not cases where an attorney's misconduct, in his private capacity merely, and not in his official capacity, may be of so gross a character that the court will exercise the power of disbarment. There is too much of authority to the contrary to say that. Is the present case one of such character?

As the case is presented on the part of the relator it is quite an aggravated one, but there are favoring circumstances for respondent which mitigate the case as thus presented. The misconduct alleged is in the mortgaging of the property, the making sale of it, and withholding the proceeds upon the pretext of the Pease suit, fraudulently got up, as alleged, by the respondent himself, for that purpose. There is no question that respondent made disbursements and incurred liabilities in respect of the property. Plans and specifications for building were made and changed, and different architects engaged in the matter. Successive loans for building were negotiated for by different brokers. Liabilities were thus incurred by respondent, he being the ostensible owner. One

architect was threatening him with a suit for $100. Some $164 of taxes were paid by respondent. Very much of respondent's time during some five months was occupied by relator in relation to the matter,—so much of it, Mr. Rogers testifies, that he required that respondent should allow the firm $500 for the amount of time which had thus been taken from the firm's business; that this was done, and respondent was charged for that amount on the books,—not as being the amount which relator should pay, but as the sum which, as between themselves, should be charged against respondent. There was evidence, coming from the relator himself, that he agreed to pay respondent for his services, and some evidence tending to show that it should be suitable compensation for a lawyer's time thus occupied. Upon the hypothesis of such an agreement, and the amount of time spent, which there was disinterested evidence tending to show was spent, respectable witnesses testified that the compensation should be $1000 or more. As to such compensation, if any were due, there might honestly be quite a difference of opinion. It can not be said that the claim of respondent was wholly baseless. It was a just one for some amount, and if nothing could be obtained from relator upon it, and respondent stood in need of the money, and informed relator that he would secure himself on the property, the resort afterward to a mortgage upon the property of $1500, for the purpose of securing his pay, however unjustifiable it might have been, can not be pronounced to be a transaction of such moral turpitude as to demand respondent's expulsion from the bar, as being unfit to practice his profession. Wrong conduct there may have been, and not the corrupt intent charged.

As to the sale of the lot, independent of respondent's testimony that it was with the approval of relator, there is evidence that respondent was making efforts to sell the lot with relator's concurrence. There is in the case a letter from respondent to relator, of date December 13, 1879, saying:

"Your price for selling I find too high for the market.   Shall I reduce it to $4500?   Why don't you come in?"   Respondent's excuse for selling the lot as he did, was, that he had just before received a letter from Mr. Wakeman, the solicitor for complainant in the Pease cause, threatening suit on the Roberts claim; that he made an ineffectual effort to see relator, and thought it best for the protection of the property to make sale of it, as he did, without any delay.   Wakeman was a witness, and he is not inquired of as to the sending of such a letter, so we think it may be taken that such a letter was sent.   As to the lot being sold at a greatly inadequate price, as claimed, several witnesses testify that it was sold for its market value.   We can hardly say there was corrupt conduct in making this sale.

As to respondent having caused the Pease suit to be brought for the fraudulent purpose alleged, all the evidence thereof seems to be the quickness with which the bill was filed after the sale, being on the next day, and its being drawn by Mr. Burrows, and then brought to Mr. Wakeman, who signed it as solicitor; and the latter would seem to have had no other connection with the bringing of the suit than thus signing the bill.   From bringing the suit so soon after the sale, it requiring considerable time to prepare such a bill, it might be a just inference that Burrows or Pease had notice that the sale was to be made, some time beforehand, but there would be no proper inference of anything further.   Mr. Burrows had some relation of intimacy with respondent, having had employment in the office of Rogers & Appleton for some of the time during the summer and fall of 1879.   These were suspicious circumstances, but they do not amount to the satisfactory evidence which is required in such case of the charge alleged,—that this Pease suit was all a sham and fraudulent contrivance on the part of respondent to enable him to keep in his hands the proceeds of the sale of the lot.

As to the Roberts claim, and the Pease suit brought upon it, being so utterly groundless, as claimed, that they should have been no obstacle to paying over this money, it is to be remarked that relator had been told by a lawyer of eminence that if he bought the lot at the insurance company's foreclosure sale, the title might inure to Gookins & Roberts, under their judgment against relator and purchase at execution sale of the equity of redemption. It was on account of this that relator had the Bryan deed made to respondent, instead of to himself. When one of the building loans had been arranged for; it was found that in order to its completion the abstract of title would have to go into the hands of the attorneys who obtained the Gookins & Roberts judgment. Relator for that reason dropped the loan. Relator himself thus entertaining real apprehension in regard to the Gookins & Roberts claim, it would not seem to be for him to say that respondent's apprehension concerning it is but a mere pretense, and impute it as dishonest and corrupt conduct in him to be unwilling to pay over the proceeds of the sale of the lot whilst that Pease suit was pending against him. Efforts were made for settlement. The ultimatum which relator announced to respondent was, that the latter should pay $8000, with nothing for his disbursements or services. The controversy was the proper subject matter of a bill in equity. It may, and should, be settled in the pending Pease suit.

We have not attempted to enter into a detail of the evidence with any fullness, and have but adverted to some favorable circumstances to show that the present is not a case of such gross misconduct of an attorney in his private capacity as to call for the proceeding against him for disbarment.

We are of opinion the rule ought to be discharged.

*Rule discharged.*

Mr. JUSTICE MULKEY, dissenting:

I regret that I am unable to concur in the conclusion reached in this case by a majority of the court. If I were to consult my feelings alone, I would most certainly suffer the case to pass in silence, without even noting my dissent upon the record; but a sense of official duty will not permit this course. I therefore deem it proper to state, in as few words as I conveniently can, the general view I have of the case as it appears, from the evidence, to me.

Taking the most favorable view of the case, after giving Appleton the benefit of all doubts, the simple, unvarnished facts are, in substance, these: The relator, an attorney of the Chicago bar, for his own convenience, and to accomplish certain purposes of his own, conveyed to Appleton, a brother attorney of the same place, in trust, certain real estate in Chicago, where both parties then lived, and still live, by means of which conveyance the relation of trustee and *cestui que trust* was established between them. The declaration of trust executed by Appleton to Hughes was not recorded, but the conveyance was, so that the record showed the absolute title to be in Appleton. Some time after the transfer, Appleton, claiming to have incurred some expenses on account of the trust property, mortgaged the same, to secure a loan to himself of $1000, and appropriated the money to his own use. Not satisfied with the fruits of this flagrant breach of duty, which was largely in excess of any claim, or pretended claim, he then had against Hughes on account of the property, he subsequently took up this mortgage, and at the same time executed another, to secure an additional loan to himself of $1500. His rapacity being still unsatisfied, he finally sold and conveyed the property out and out, for $6000, no part of which has ever been paid to Hughes. All this was done without the knowledge or consent of Hughes, and in palpable violation of his rights. If the trust property had been con-

verted into money, and placed by Hughes into Appleton's hands, and the latter had appropriated the proceeds in the same manner he did the land itself, Appleton would, under our statutes, clearly have been guilty of larceny, and, so far as the moral turpitude of the two acts is concerned, it is manifest there is no difference between them.

To the case thus clearly made out against the respondent, he interposes the technical defence that in appropriating the relator's property to his own use in the manner we have seen, he was acting merely *as trustee,* and not as an attorney, and upon this ground alone the majority of the court have mercifully permitted him to escape. This defence so forcibly reminds me of the old story of the profane bishop, who had the good fortune to be a duke also, I can not refrain from telling it. An acquaintance, who happened to overhear him using profane language, asked him how it was that he, being a bishop, could be guilty of swearing. "Ah, my friend," replied his reverence, "I swear as a duke, and not as a bishop." "But," retorts the other, "when the devil comes to get the duke, what will become of the bishop?" So in this case, when his satanic majesty calls for Appleton, the trustee, I should like to know what will become of Appleton, the lawyer.

Under our statute no one can legally procure a license to practice law in this State without first procuring a certificate of good moral character from some court of record. By this requirement it is evident the legislature intended that no one should be admitted to the bar who was not, in truth and in fact, a good, moral man; and if this be an essential condition, as it certainly is, to one's admission to the bar in the first instance, it is certainly equally essential that he should maintain this character after he has been once admitted, and I maintain that whenever his conduct is such, whether he is acting professionally or otherwise, as to demonstrate that he is not an honest man, he should be disbarred, for by

becoming or being dishonest he violates the essential condition upon which he was admitted, and forfeits all claims to recognition among his professional brethren or by the courts of the State. But, outside of this statutory requirement, it is manifest a man who is not honest and honorable in all his business relations, whatever may be his qualifications otherwise, is clearly unfit for the discharge of the grave, and often delicate, responsibilities which the practicing attorney is, from day to day, required to assume. The highest conceivable interests are intrusted to his care. Fortune, reputation, liberty, and even life itself, are placed in his hands. This being so, it is manifest no one should be permitted to practice law who is not strictly honest. To permit it to be done is not only unjust to the community at large, but it is especially unjust to the profession itself, as the reputation of all must suffer more or less from it. It gives color to the popular idea that obtains in the minds of many, that lawyers, as a class, are a set of mere sharpers and tricksters. The better class of the bar of this State occupy a high moral plane, and as an humble member of this court I feel it my duty to lend them all the encouragement and aid within my power to maintain the high standard of professional ethics which they have established, and which has cast so much lustre on the Illinois bar; and this can only be done by holding all, from the highest to the lowest, without regard to their social connections, to a strict accountability for every substantial breach of moral duty which shows a disregard for common honesty.

Mr. JUSTICE WALKER: I fully concur in the views expressed by my brother MULKEY in this dissenting opinion.