THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* WALTER J. HOERING, Respondent.

*Opinion filed June 18, 1925.*

1. DISBARMENT—*attorney may be disbarred for misconduct outside professional capacity.* Although, as a general rule, an attorney will not be disbarred for misconduct not in his professional capacity, there may be misconduct of an attorney in his private capacity so gross as to require his disbarment.

2. SAME—*when attorney will be disbarred for refusal to turn over trust fund.* An attorney employed to negotiate the sale of a retail store business, and to whom a certain sum of money is paid with which to settle the claims of certain creditors of the vendor, is guilty of malfeasance in his office as attorney at law sufficient to warrant his disbarment, where he refuses to pay the money over to the creditors or to return it after repeated demands of his client, who furnished him a list of the creditors.

3. SAME—*what misconduct, generally, warrants disbarment.* Willful violation of his constitutional oath by an attorney in refusing to discharge a duty to a client in relation to trust funds placed in the attorney's hands, or to turn over to or pay out for a client trust funds received by the attorney for the payment of claims, willfully swindling another, or converting to the attorney's own use funds entrusted to him for safekeeping or deposit, constitutes sufficient ground for disbarment.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

ANDREW J. O'DONNELL, for respondent.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

By leave of court the Chicago Bar Association, on behalf of the People, filed an information in this court for the disbarment of respondent, Walter J. Hoering, an attorney and counselor at law. The information originally filed consisted of two counts. Respondent filed an answer

to the information, and a commissioner was appointed, who took the evidence and made her report. Thereafter two additional counts were filed. The evidence was taken on the additional counts by the same commissioner, who reported and recommended the discharge of the rule as to the original counts and the first additional count. As to the second additional count the commissioner found that respondent was guilty of malfeasance in his office of attorney and counselor at law and recommended that he be suspended from practice for six months. Relator and respondent both filed objections to the commissioner's findings and the objections were overruled. Exceptions were then filed by relator, and the record is brought to this court for review on such exceptions.

The first count charges, in substance, that about February 1, 1922, H. L. Swenson employed respondent as his attorney in the purchase of a drug store; that a deal was made by which Swenson was to pay for the store $15,500, and he delivered to respondent $1500 to bind the purchase; that the deal was later canceled by Swenson, who demanded the return of his money; that respondent failed to return any part of the money and fraudulently converted the same to his own use; that on May 3, 1922, respondent gave Swenson his check on Greenebaum Sons Bank and Trust Company for $1500, payment of which was refused by the bank for want of sufficient funds of respondent; that on May 15, 1922, respondent delivered to Rosenstone & Shanesy, the attorneys for Swenson, a check for $750 on the same bank as part payment, payment of which was also refused by the bank for like reason aforesaid, the balance in the account of respondent being only $1.33, and he has not had a larger balance in his account since May 3, 1922.

The second count charged that for a year prior to January, 1922, Fred S. Brunken was a client of respondent and twice during that month loaned respondent $500, which sums were re-paid; that on February 7, 1922, respondent

borrowed from Brunken $1000 and gave him his judgment promissory note for $1200, payable March 5, 1922, which was later extended to April 4, 1922; that he later gave a check to Brunken in payment of the note, which he then received and destroyed, payment of which check was refused for want of sufficient funds of respondent. Respondent failed to comply with repeated demands of Brunken for the money, except that on June 10, 1922, and at another time after complaint was made to the Chicago Bar Association, he paid to Brunken $200 and $300, respectively.

Respondent admitted by his answer that he was licensed as an attorney at law by the Supreme Court of Illinois on October 13, 1915. He denied many of the charges in the two counts and sought to explain some other matters by the evidence. The second count is proved as charged. The first and second loans of $500 were each re-paid, each within a month after the same was loaned, together with $50 and $100, respectively, as profit or interest. There was paid by respondent $200 to Brunken on the third note, and then Brunken hired an attorney, who by labored efforts secured two other payments of $250 and $100 in money, and later a watch for $100, furniture for $150, and a note for the balance, upon which judgment was taken. The note was finally fully paid after much delay and repeated duns, one check of respondent being returned unpaid for want of sufficient funds in the bank. It was not finally all paid until resort was had to the bar association by the charges aforesaid. The relation of attorney and client between Brunken and respondent was neither charged nor proved as to the second count.

The facts established under the first count are, that in 1922 H. L. Swenson, a drug clerk, being desirous of purchasing a drug store for himself, talked with Lee Kramer, a friend and former schoolmate and roommate, who sold drug supplies, about buying a drug store. After considering several places Swenson was inclined to consider the pur-

chase of the Schmidt drug store, which had been originally offered for $18,000 but which Kramer later told Swenson could be purchased for $16,500, of which sum $1500 was to be paid in cash. On one occasion respondent had driven Swenson and Kramer in his automobile to look at the store. Respondent had been employed previously as Kramer's attorney and also for Swenson's employers but had never acted as Swenson's attorney. Swenson stated that he expected respondent to look after the legal part of the transaction, but no fee was agreed on and nothing was said regarding the employment of respondent as Swenson's attorney. Kramer succeeded in getting Schmidt to agree to sell the drug store for $15,500, $500 of which was to be paid in cash. He and respondent then went to Swenson's home, and Kramer told him, in the presence of respondent, that the price of the store was $16,500, $1500 of which must be paid in cash. Swenson then obtained a cashier's check for $1500. There is a dispute as to whether the check was delivered to Kramer or respondent. The proof does show that respondent gave Swenson a receipt for the money and that the check was deposited in respondent's bank to his account, and on the same day he drew a check for $500, payable to Kramer. Respondent's explanation of the transaction is, that $1000 of the payment was to be Kramer's commission for making the sale and that Kramer was to loan him the $1000, as he was badly in debt; that the $500 check to Kramer was for the cash payment to Schmidt. Kramer got in touch with Schmidt over the telephone and requested him to go to respondent's office to complete the deal. In the meantime Swenson had decided to purchase another drug store, and when Schmidt appeared at respondent's office he was informed that the deal was off. Respondent asked for the $500 back from Kramer, who insisted that Swenson should be held to his agreement. Respondent then gave a $1500 check to Kramer, to be delivered to Swenson when Kramer deposited his $500 and a Mr. Scharf

deposited an expected $1000. Kramer endorsed the check
without recourse and delivered it to Swenson before the de-
posits were made, and the check was not paid for want of
sufficient funds, respondent only having $1.33 in the bank.
Thereafter respondent gave his check to Swenson's attorney
for $750, payment of which was also refused by the bank
for want of sufficient funds. Respondent's explanation re-
garding his bank account is, that it was nearly the amount
of the check when given and would have been that amount
if the bank had not charged against his account some other
checks he had deposited and with which the bank refused
to credit him because the makers of the checks had not suf-
ficient funds in the bank. After complaint had been made
against respondent to the Chicago Bar Association he paid
a part of the amount, and later, since the filing of the in-
formation against him, has paid all the amount due Swen-
son. There is some question as to whether or not respond-
ent and Kramer were legally obligated to return the $1500
to Swenson after he had changed his mind. Nevertheless,
respondent promised to return it and was very slow in
doing so, evidently because he was very hard pressed for
money. The evidence does not show that he was to receive
any part of the $1000 commission and that he was not to
receive anything from Swenson for his services as attor-
ney. The proof does not show that he was guilty of any
criminal offense. It does show that he and Kramer did not
tell Swenson that a profit of $1000 was to be made on the
transaction for Kramer. On the other hand, respondent,
while he heard Kramer state to Swenson that the cash pay-
ment was to be $1500 instead of $500, yet made no rep-
resentations to Swenson about it.

The facts proved and which support the first additional
count are, that during the first half of the year 1922 Louis
A. Endres was accustomed to call about three times a week
to visit respondent's sister. Respondent frequently took En-
dres home in his car after he had finished his call. On one

of these occasions respondent and Endres were in the front seat of the automobile and one Stamps was in the rear seat. Respondent told Endres that he was in need of $1000, and Endres said that he had only about $850 and would loan that amount to respondent. Endres was a clerk in a storage house, earning a salary of $40 a week. He had previously been in business and had sold it. He was collecting the payments from the sale of his business, and his savings from his work, together with the payments that he had received from the sale of his business, amounted to $857, which was deposited in his savings account in a bank. The next day after this conversation respondent went to the place where Endres worked and Endres gave him a withdrawal order for $850. Respondent signed and gave Endres this paper: "Feb. 17, 1922.—Received of Louis Endres $850. Due on demand." Respondent took the withdrawal order and obtained the $850. According to the testimony of Endres, at a later time, about April, 1922, as a matter of convenience, his place of work being a considerable distance from his bank, he asked respondent to deposit $50 in his savings account for him. Respondent said that he would. Endres then gave him his bank book and the $50 to deposit for him. Thereafter on two other occasions he gave respondent $50 for deposit, with a like request that he deposit said sums in the Greenebaum Sons Bank and Trust Company, where his deposit account was. None of these sums were ever deposited by respondent, and he did not return to Endres the bank book until the hearing before the commissioner, although Endres made repeated demands on him for it. After many requests for his bank book Endres went to the bank and found that respondent had not made the deposits, amounting to $150, that he had requested him to make. Nothing further was done by Endres about the payment of the $850 or the $150 for several months, except that he often asked respondent for the bank book and that he deposit the $150 in the bank. Endres

finally had a meeting with him and demanded the payment of the $850 and the $150. Respondent then made out two judgment notes for $150 and $850, dated February 22, 1922, (the day respondent had obtained $850 from Endres,) and gave these notes to him. Endres took the notes but thereafter wrote to respondent that he did not intend to accept them in settlement of the account.

The testimony of respondent, which is supported by the testimony of Stamps, is that Endres was to loan him $1000, and that the giving to him of the $50 on three different occasions was to make up the $1000 after including the $850 previously loaned to him. Respondent has never re-paid any of the $1000. It also appears that the paper signed by respondent acknowledging receipt of the $850, which he had given Endres, was in the bank book which Endres turned over to him for the purpose of having the aforesaid deposits made. It was presented by respondent on the hearing before the commissioner, together with the bank book. Respondent admits that his possession of this paper was an oversight on the part of Endres.

The commissioner very properly found that the relation of attorney and client in this transaction did not exist between respondent and Endres. She also found that the weight of the evidence is to the effect that the transaction amounted to a loan from one friend to another. It is true that respondent is supported in his testimony by Stamps as to the character of the transaction concerning the three amounts, of $50 each, placed in the hands of respondent by Endres. It is also true that Endres is entirely supported by the very strong circumstance that respondent was in possession of his bank book, in which was placed the paper evidencing the receipt of the $850. Respondent's testimony does not satisfactorily account for his possession of this bank book, although it is supported by Stamps. We can not agree with the commissioner that there is no evidence to show that respondent "fraudulently converted" the three

sums of $50 each to his own use. The evidence points strongly that way notwithstanding the testimony of respondent and Stamps. Respondent's action in this matter deserves very severe censure. He has manifested no disposition to pay back the amount due Endres but puts himself in the attitude of positively refusing to pay it, his only excuse for his unwillingness being the fact that this complaint was made to the Chicago Bar Association. Respondent seems to ascribe this proceeding as evidence of malice on the part of Endres, inspired by the fact that the close relations between him and the respondent's sister had been broken off. It seems to us the conduct of respondent in securing the loan might just as aptly be interpreted as an attempt by him to take advantage of Endres by reason of such relations with his sister. His refusal to pay Endres on the ground aforesaid is simply inexcusable. The whole transaction on the part of respondent is altogether inconsistent with common honesty and decency as between one citizen and another, and is entirely inconsistent with the conduct expected from an attorney and counselor at law who holds the license of this court to practice his profession.

It is the general rule that an attorney at law will not be disbarred for misconduct not in his professional capacity. Nevertheless, there are exceptions to this rule, and this court has held that there may be misconduct of an attorney in his private capacity so gross as to require his disbarment. *People* v. *Appleton,* 105 Ill. 474.

It is charged in the second additional count that respondent acted as the attorney for one Mulligan in the purchase of a drug store. Mulligan agreed, as a part of the purchase price, to assume $1100 of the indebtedness existing against the drug store at the time of his purchase. It was afterwards learned that there was an additional indebtedness of $512.83, and the sellers deposited in the hands of respondent this sum of money for the payment of that indebtedness. Respondent executed a receipt for this money.

He was thereafter given a list of the additional creditors, but refused to pay the sums due these creditors except as to one amount of $122.81. Mulligan made repeated demands upon respondent to pay the other claims and sent him a list of the creditors and the amount due each. Respondent refused to pay these creditors, and by reason thereof is guilty of malfeasance in his office as attorney at law.

The evidence as to the second additional count shows that in the negotiations of Mulligan with Cohen & Garvey, respondent represented Mulligan as his attorney and that he prepared the memorandum of agreement. From the evidence it appears that Mulligan was to pay all the debts, which at that time were determined to be $1100. Later, when the debts were shown to exceed that amount by $512.83, Cohen & Garvey paid that sum to respondent, who signed a paper reciting that the total liabilities of the Irving-Kimball pharmacy amounted to $1612.83,—$512.83 more than Mulligan had assumed and agreed to pay. Respondent agreed in the instrument signed by him that he would use the $512.83 to pay the liabilities and procure from Mulligan a release and discharge for all claims and demands by reason of such additional liabilities. This payment to respondent was made about a week or ten days after the purchase of the store. Respondent testified that this money was to be expended by him after Mulligan had paid the $1100 of bills assumed by him. No such conditions are shown in the receipt or statement that he signed. Out of the money received by him respondent has only paid one creditor of the store the sum of $122.81. He has failed to pay any of the other creditors or return the balance of the money so received. Mulligan made repeated demands upon him to pay the balance to the creditors or to deliver the money to Mulligan so he could do it. Respondent sought to excuse this payment of money on the ground that a list of creditors had not been furnished him. A list was thereafter sent to him, showing the names of the creditors

and the amount due each one of them. Respondent also insisted that the money was not to be expended by him until the $1100 had been paid by Mulligan. Mulligan employed a firm of lawyers to collect the balance from respondent or compel him to pay it to the creditors. The lawyers made repeated demands on him, and finally wrote him that Mulligan and Cohen & Garvey had taken care of all the other obligations of the store with the exception of the ones placed in his hands. Thereafter complaint was made by Mulligan to the Chicago Bar Association. Respondent, in reply to a letter from the grievance committee of the bar association, stated that he would pay the money upon a satisfactory showing that the $1100 had been paid. It was not the contention of either Cohen or Garvey, or of anyone else except respondent, that there was any understanding that the money was placed in his hands and to be paid out only when Mulligan paid the $1100. After the complaint was filed with the bar association respondent refused to pay any of the money until the matter was disposed of by that association. The evidence in the record shows clearly that the payment by Mulligan of the $1100 had nothing to do with the payment of the other accounts by respondent. Respondent was acting as an attorney at law for Mulligan as well as for the other parties. All of respondent's excuses were met by his client. A list of the creditors was furnished him, and the attorneys for Mulligan stated that all the indebtedness had been paid except such as the money in respondent's hands was to pay. Respondent was acting in a fiduciary matter, and he should either have paid out the money as directed or have terminated his connection with the matter and returned the money to those from whom he received it. He has not only refused to pay the money as he agreed to do but has failed to return it. His conduct in this regard has been not only defiant, but he has acted without regard to his oath of office and his duty as attorney and counselor at law.

Such conduct of respondent as has been disclosed by the evidence under the first and second additional counts cannot be tolerated by this court, whose duty it is to guard the public in its relations with the members of the legal profession. Attorneys and counselors at law in this State bear the distinction of being members of the only profession whose members are required to take and subscribe an oath to support the State and Federal constitutions, and in addition thereto an oath that they will to the best of their ability discharge the duties of the office of attorney and counselor at law. Whoever willfully and deliberately violates his constitutional oath by depriving or attempting to deprive any citizen of this State of any right guaranteed by the bill of rights of our State constitution or by the Federal constitution, and whoever, as such attorney and counselor at law, willfully and deliberately violates his oath as attorney by refusing to discharge his duty to any client in relation to trust funds placed in his hands and deliberately refuses to turn over to or pay out for his client trust funds received by him for the payment of claims, or willfully and deliberately swindles another, or converts to his own use funds entrusted to him for safe keeping or for deposit in bank, is unworthy of having his name upon the roll of attorneys and counselors of this court.

The findings and recommendations of the commissioner will be sustained as to the original counts. The objections of the relator to the findings and recommendations of the commissioner as to the first and second additional counts will be sustained.

We find from the evidence that respondent is guilty as charged in the first and second additional counts, and that the rule should be made absolute and the name of respondent stricken from the rolls.          *Rule made absolute.*